

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

TJT/JPL:PJC
F. #2021R00440

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

December 2, 2024

By ECF

The Honorable Allyne R. Ross
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Hua Huang
      Criminal Docket No. 23-234 (ARR)

Dear Judge Ross:

  Medicare and Medicaid paid more than $5.8 million for medically unnecessary prescription medications whose dispensing was induced by defendant Hua Huang and her co-conspirators' brazen payment of kickbacks and bribes in the form of supermarket gift certificates and cash, a practice that is endemic in Brooklyn and Queens pharmacies.  A significant custodial sentence is necessary to deter this conduct that drains public health resources, undermines trust in federal health insurance programs, and drives legitimate health care providers from the marketplace.

  The government respectfully submits this letter in anticipation of sentencing in the above-referenced case, which is scheduled for December 18, 2024, and in response to Huang's November 25, 2024 sentencing submission.  (The "Defense Submission.")  Considering the seriousness of the offense, the harm caused to federal health care programs, and the significant need for deterrence, the government respectfully submits that a sentence within the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 24 to 30 months is sufficient, but not greater than necessary, to achieve the goals of sentencing.  See 18 U.S.C. § 3553(a).  The government also respectfully requests that the Court order Huang to pay restitution in the amount of $5,825,067.91 to Medicare.

I. Background & Procedural History

  Medicare and Medicaid are vital federal health care programs that provide insurance coverage to the elderly and those who cannot afford health insurance.  (Presentence Investigation Report ("PSR") ¶¶ 3-9.)  This coverage includes prescription drug coverage, and, in some instances, a monthly credit for over-the-counter ("OTC") items, which ranges from

$100-$200.  (Id. ¶ 10.)  The monthly OTC credit can be used to purchase OTC items, such as bandaids, vitamins, and OTC pain relievers.  OTC transactions are processed by scanning the eligible items at a register and swiping the OTC card to deduct payment, similar to using a pre-loaded debit card.  (Id.)  If the OTC credit goes unused, it is forfeited at the end of the month.  (Id.)  By submitting claims for OTC items or prescription drugs, pharmacies certify that the items were actually dispensed, were medically necessary, and were not induced by kickbacks and bribes.  (Id. ¶ 12.)

As charged in the indictment and outlined in the PSR, Huang worked at Elmcare Pharmacy Inc. ("Elmcare") and NY Elm Pharmacy Inc. ("NY Elm")[1] as a clerk providing customers with their prescriptions from 2020 until her arrest in December 2022.  (Id. ¶ 64.)  A regular part of her job was providing kickbacks and bribes to customers in exchange for them bringing profitable podiatry prescriptions to the pharmacies, which were often prescribed by doctors to whom Huang and other employees referred customers.  (See id. ¶ 24.)  The kickbacks and bribes took two forms: supermarket gift certificates, which were provided to the customers for specific profitable podiatry medications, and cash, which was provided for the entire balance of the customers' OTC card.  (Id. ¶ 22.)

A confidential witness's ("CW") interactions with Huang and other Elmcare and NY Elm staff are representative of the customer experience at those businesses, as confirmed by multiple cooperators in this case.  When the CW went to Elmcare in November 2021, he/she approached Huang and began the conversation by asking what benefits he/she would receive if he/she brought prescriptions to Elmcare.[2]  Huang told the CW that he/she "need[ed] to see our doctor," and "if there are foot doctor medications, I can give you $3 each prescription.  Without foot doctor medications, nothing."  When the CW showed Huang his/her OTC card and asked about it, Huang said, "we can give you . . . whatever is on there."  She then promised to swipe his/her OTC card and provide $150 cash, but only "after you see the podiatrist."

The CW returned to Elmcare in December 2021.  During that visit, Huang asked if the CW had seen a specific doctor to which the pharmacy referred him/her.  When the CW said no, Huang told the CW, "we have someone that will bring you."  The CW asked again about the OTC card, and Huang told the CW, "go see the doctor first."  Another Elmcare employee then filled out the doctor's patient intake paperwork for the CW before walking the CW to the doctor's office.  When the CW walked back to Elmcare, he/she provided a prescription for medically unnecessary prescription shoes to Huang, which Huang said she would submit, and she handed the CW an envelope containing $150 cash from his/her OTC card.

The CW returned to Elmcare in January 2022.  During that visit, Huang gave the CW supermarket coupons for each of the podiatry medications prescribed in December 2021 through the pharmacy's doctor and $155 in cash for the CW's OTC card.  The CW asked Huang

---

[1] When Elmcare lost its main prescription drug insurance contract, it rebranded as NY Elm with new ownership on paper.

[2] The CW's visits to Elmcare and NY Elm were video and audio recorded and translated from Mandarin to English by an agent fluent in both languages.

if he/she could leave the drugs, implying he/she did not need them, and Huang told the CW "if you leave it, I'm going to throw it out, either you throw it out or I throw it out." The CW then asked about exchanging the drugs, again implying they were unnecessary, but Huang said no. Huang did not attempt to reverse the prescriptions or alert the pharmacist that they were unnecessary.

When the CW visited Elmcare again in November 2022, it had by then become NY Elm. The CW asked Huang if the benefits, including the supermarket gift certificates and OTC cash, remained the same, and she confirmed that they did. The CW gave Huang his/her OTC card, and Huang confirmed it had $155 on it, but she refused to provide the CW with cash for the OTC card because he/she had not recently sent prescriptions to the pharmacy.

In December 2022, and concurrent with Huang's arrest, law enforcement searched NY Elm. During that search, agents recovered thousands of dollars in cash in an unplugged refrigerator below the front counter, cash in prepared envelopes consistent with what Huang provided the CS for his/her OTC card, thousands of dollars in supermarket gift certificates to various supermarkets, intake forms for a nearby podiatry doctor who was a top prescriber at Elmcare and NY Elm, and numerous customers' OTC cards.

On March 19, 2024, Huang pleaded guilty before Your Honor to conspiracy to pay health care kickbacks, in violation of 18 U.S.C. § 371.[3]

II.     The Defendant's Guidelines Range

The PSR correctly calculates Huang's Guidelines range as follows:

| Base offense level (U.S.S.G. §§ 2X1.1, 2B1.1(a)) | 8 |
|---|---|
| Loss exceeding $1.5 million (U.S.S.G. §§ 2B1.1(b)(1)(J)) | +18 |
| Minimal participant (U.S.S.G. § 3B1.2(a)) | -4 |
| Zero-point offender (U.S.S.G. § 4C1.1) | -2 |
| Acceptance (U.S.S.G. § 3E1.1(a),(b)) | -3 |
| Total adjusted offense level | 17 |

(PSR ¶¶ 31-40.) Based on Criminal History Category I, Huang's Guidelines range is 24 to 30 months' imprisonment.

---

[3] To date, the government has charged nine individuals in this conspiracy. Huang is the first to be sentenced.

III.       A Guidelines Sentence Is Appropriate

     A.       Legal Standard

In <u>United States v. Booker</u>, the Supreme Court held that the Guidelines are advisory and not mandatory, and the Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentences, but also may tailor the sentence in light of other statutory concerns. 543 U.S. 220, 245 (2005); <u>see</u> 18 U.S.C. § 3553(a). Subsequent to <u>Booker</u>, the Second Circuit has held that "sentencing judges remain under a duty with respect to the Guidelines . . . to 'consider' them, along with the other factors listed in section 3553(a)." <u>United States v. Crosby</u>, 397 F.3d 103, 111 (2d Cir. 2005). Although the Second Circuit declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, it cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." <u>Id.</u> at 113.

Subsequently, in <u>Gall v. United States</u>, 552 U.S. 38 (2007), the Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." <u>Gall</u>, 552 U.S. at 49 (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the Court] may not presume that the Guidelines range is reasonable. [The Court] must make an individualized assessment based on the facts presented." <u>Id.</u> at 50 (citation and footnote omitted).

Title 18, United States Code, Section 3553(a) provides numerous factors that the Court must consider in sentencing the defendant. These factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to (a) reflect the seriousness of the offense, to promote respect for the law and to provide just punishment, (b) afford adequate deterrence to criminal conduct, (c) protect the public from further crimes of the defendant, and (d) provide the defendant with appropriate education or vocational training; (3) the kinds of sentences available; (4) the Guidelines range; (5) pertinent policy statements of the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution.

     B.       Application of Law

The government respectfully requests that the Court impose a sentence of 24 to 30 months' imprisonment because such a sentence is sufficient but not greater than necessary to achieve the goals of sentencing. <u>See</u> 18 U.S.C. § 3553(a). Specifically, the circumstances in this case, the history and characteristics of the defendant, the need to promote respect for the law and provide just punishment, and the need for general deterrence warrant a Guidelines sentence.

1. <u>The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant Warrant a Guidelines Sentence</u>

Huang was the front line of a large-scale scheme to defraud federal health programs through the payment of illegal kickbacks and bribes. As described above, she directed customers to specific doctors with promises of kickbacks, paid cash to customers for OTC items that were not actually dispensed, and understood that these kickbacks were a quid pro quo for specific podiatry medications. She further understood that these medications were medically unnecessary, as customers sought out the kickbacks, not the medications, were directed to podiatry doctors because their prescriptions were profitable for the pharmacy, and the CW, in particular, attempted to refuse the prescriptions. Huang's crime was not a momentary lapse in judgment. With the OTC kickbacks in particular, she was required to scan multiple items to reach the OTC card's limit and then count out the cash equivalent using cash that was not in the register, while knowing that none of the scanned items were being dispensed even though they were being claimed to the insurers. This was pure theft at its core.

The history and characteristics of the defendant also warrant a Guidelines sentence. Huang's crime does not appear to be one of necessity. She is college educated, having earned the equivalent of an associate's degree while in China. (PSR ¶ 59; Defense Submission at 2.) She also was gainfully employed the entire time since she entered the United States. (<u>Id.</u> ¶¶ 65-69.) Notwithstanding that she had a minimal role in the overall scheme, her conduct shows that she was willing to steal from federal health care programs on a routine basis over a prolonged period. Further, she committed this crime after being ordered removed from this country for lack of immigration status, which shows disregard for the rule of law. (<u>Id.</u> ¶ 50.) Her otherwise law-abiding life does not negate this serious conduct. (<u>See</u> Defense Submission at 4.)

2. <u>A Guidelines Sentence Appropriately Reflects the Seriousness of the Offense, Promotes Respect for the Law, and Provides Just Punishment</u>

There can be no dispute that health care fraud is a serious crime. Annual losses tied to health care fraud are estimated to be in the tens of billions of dollars.[4] The 3553(a) factors require that the punishment reflect the seriousness of the offense, and by giving a Guidelines sentence to Huang for using customers to take advantage of Medicare and Medicaid, the Court will promote respect for the law and provide just punishment for a serious crime. To allow a blatant bribery scheme and fraud like the one Huang has been convicted of to be punished through only economic penalties like restitution—which Huang appears to have no ability to satisfy—would grossly undermine the seriousness of the offense and send a message to the pharmacies on every corner in Brooklyn and Queen that crimes like this are worth committing because defendants are unlikely to face serious punishment.

---

[4] https://www.nhcaa.org/tools-insights/about-health-care-fraud/the-challenge-of-health-care-fraud/#:~:text=The%20National%20Health%20Care%20Anti-Fraud%20Association%20%28NHCAA%29%20estimates,the%20tens%20of%20billions%20of%20dollars%20each%20year (last accessed Nov. 25, 2024).

Evidence suggests this is exactly how these defendants view this crime. In a recorded conversation involving Terry Kim, the owner of Elmcare and NY Elm whose case is also before this Court, Kim told his co-conspirators, in sum and substance, that kickbacks were not a big deal, while expressing real concern with being involved with money laundering.

        3.      A Substantial Sentence Affords Adequate Deterrence and Protects the Public

A Guidelines sentence is necessary to deter others from engaging in similar schemes and to protect the public from the pilfering of vital, resource-limited public health programs. As the Second Circuit has noted, significant sentences are particularly appropriate in white collar crimes to promote general deterrence. See, e.g., United States v. Goffer, 721 F.3d 113, 132 (2d Cir. 2013) (noting that some feel that white collar crimes are a "game worth playing"). "'Persons who commit white-collar crimes like [d]efendant's are capable of calculating the costs and benefits of their illegal activities relative to the severity of punishments that may be imposed. A serious sentence is required to discourage such crimes.'" United States v. Vrancea, 136 F. Supp. 3d 378, 392 (E.D.N.Y. 2015) (quoting United States v. Stein, No. 09-CR-377, 2010 WL 678122, at *3 (E.D.N.Y. Feb. 25, 2010) (Weinstein, J.)).

Further, health care fraud is a complicated crime involving difficult questions at the interstices of the medical and legal professions. For these and other reasons, the likelihood of detection is relatively low. See Diane E. Hoffmann, Physicians Who Break the Law, 53 St. Louis U.L.J. 1049, 1052 (2009) (pointing to empirical research showing that professionals believe the probability of getting caught committing a white-collar crime is low and that fraud is "relatively easy to hide and hard to detect" because the acts involved "tend to be made up of complex, sophisticated, and relatively technical actions" that are "intermingled with legitimate behavior" (internal quotations and citations omitted)). Indeed, in this case Huang and her co-conspirators went through the motions to create an appearance of legitimacy to the prescriptions being dispensed, having the CW see a doctor and receive prescriptions and scanning eligible OTC items to give the appearance that they were dispensed. By imposing a Guidelines sentence, the Court will show other would-be fraudsters that white collar crimes come with substantial penalties and are not worth the risk.

Health care fraud is also not a victimless crime. Money diverted through kickback schemes like Huang's depletes financial resources that would otherwise pay for legitimate health care services. Schemes like this also sap the resources needed to identify, investigate, and prosecute them, while also driving up health insurance costs. Finally, fraudulent pharmacies that submit claims for medically unnecessary prescriptions and attract customers through kickbacks corrupt the marketplace and drive out legitimate actors, making legitimate services harder to obtain.

While there appears little need for specific deterrence given, for example, Huang's lack of criminal history and likely deportation following completion with of her sentence, that does not undermine the fact that general deterrence remains an important consideration. A Guidelines sentence will signal to other pharmacy fraudsters that these schemes carry more punishment than just the potential requirement to repay the fraud proceeds if one is

caught, which is no punishment at all in cases where defendants cannot afford to pay or have already dissipated the fraud proceeds.

          4.     <u>A Guidelines Sentence Is Necessary to Avoid Unwarranted Sentencing Disparities</u>

A Guidelines sentence is necessary to avoid unwarranted sentencing disparities in this district and nationally. In a similar and recent case involving supermarket gift certificate kickbacks and bribes paid to pharmacy customers for medically unnecessary prescriptions, Judge Gonzalez sentenced a defendant who paid kickbacks to customers to 30 months' imprisonment. <u>See</u> <u>United States v. Chen</u>, No. 23-CR-255 (HG).[5]

Numerous cases in this district involving fraudulent pharmacy claims for items that were not provided have resulted in significant custodial sentences. For example, in a scheme in this district involving claims for expensive drugs that were not dispensed, the defendant pharmacist and pharmacy owner received a sentence of 78 months' imprisonment. <u>See</u> <u>United States v. Mohammed</u>, No. 18-CR-589, No. 20-CR-581 (ENV).[6] In another case in this district that involved claims for drugs that were not provided to beneficiaries, a pharmacist and pharmacy owner was sentenced to 30 months' imprisonment. <u>See</u> <u>United States v. Sabet</u>, No. 21-CR-140 (EK).[7] In yet another pharmacy case in this district, a pharmacist and a pharmacy owner were sentenced to 15 and 18 months, respectively, for submitting claims for expensive drugs that were not dispensed. <u>See</u> <u>United States v. Basta</u>, No. 22-CR-219 (EK).

These cases and others demonstrate the prevalence of this type of fraud in the district, and they show that a Guidelines sentence is appropriate to avoid unwarranted sentencing disparities.

IV.     <u>Restitution</u>

Under 18 U.S.C. § 3663A, the Court must impose restitution. In <u>United States v. Zangari</u>, 677 F.3d 86, 93 (2d Cir. 2012), the Second Circuit held that restitution must be measured according to the victim's actual loss, not the defendant's gain. Moreover, in calculating restitution, "these losses need not be mathematically precise," and "[a] reasonable approximation will suffice, especially in cases in which an exact dollar amount is inherently

---

[5] The <u>Chen</u> case involved approximately twice the amount of prescription drug claims, but it also spanned a much longer period.

[6] The <u>Mohammed</u> cases involved some aggravating factors, most notably that the defendant opened another fraudulent pharmacy and continued submitting fraudulent claims for drugs that were not dispensed while she was on pretrial supervision following her arrest for the same conduct. The defendant was also a licensed pharmacist. Her scheme involved approximately $4.9 million in loss over an almost five-year period.

[7] <u>Sabet</u> involved approximately $7 million in loss over a multi-year period and multiple fraudulent pharmacies.

incalculable." United States v. Rivernider, 828 F.3d 91, 115 (2d Cir. 2016) (internal quotation marks omitted).  The government respectfully submits that the Court should order Huang to pay restitution in the amount of $5,825,067.91 to Medicare, which represents the amount of money Medicare paid for medications that were medically unnecessary and induced by the payment of kickbacks and bribes.  Huang agreed to this restitution figure in her plea agreement.  (Plea Agreement ¶ 1(e).)

V.      Conclusion

For the foregoing reasons, and based on a balancing of the Section 3553(a) factors, the Court should impose a sentence of 24 to 30 months' imprisonment and order Huang to pay restitution in the amount of $5,825,067.91 to Medicare.

Respectfully submitted,

GLENN S. LEON
Chief, Fraud Section
Criminal Division
U.S. Department of Justice

BREON PEACE
U.S. Attorney
Eastern District of New York

By:    /s/
Patrick J. Campbell
Trial Attorney, Fraud Section
Criminal Division
U.S. Department of Justice
(202) 262-7067

cc:   Clerk of Court (ARR) (via email)
      Barry Goldberg, Esq. (via ECF)
      Nicole Gervase, U.S.P.O. (via email)

8